Please be seated. We're back in session. Our next case is Ragbir v. Homan. May it please the court, I'm Stanton Jones. I represent the plaintiffs and I'd like to reserve three minutes for rebuttal. The district court erred in denying a preliminary injunction and dismissing plaintiffs' First Amendment claims challenging the retaliatory deportation of Rabi Ragbir. Although the district court based its decision on a lack of jurisdiction under Section 1252G, this appeal boils down to a single question, not strictly of jurisdiction, but of substantive First Amendment law. And that is, can ICE officials, consistent with the First Amendment, surveil, arrest, and deport one of the nation's leading immigration activists in retaliation for his core political speech in support of immigrants' rights and against ICE? Put differently, does the First Amendment allow ICE to weaponize the deportation laws to silence its own most prominent critic? That First Amendment merits question is dispositive here because if, if plaintiffs have stated a viable First Amendment claim, it is uncontested that applying Section 1252G to strip jurisdiction over that claim would itself be unconstitutional. I have a question about the injunction. What is the injunction you're seeking, the precise terms of it? So, um, uh, first of all, I would say questions about the specific remedy are a long way off here. We're at the preliminary injunction stage, but we're asking for an injunction. But then eventually what you're, it goes to the question of, of likelihood of success. I want to know ultimately what the injunction is you're seeking. Sure. The injunction that we're seeking is, uh, a routine injunction in constitutional and First Amendment litigation. We're asking that the defendant, uh, be, that I'm sorry, that Mr. Rugbeer be restored to the status quo ante, that the government be enjoined from carrying out the retaliatory and unconstitutional deportation. Now, how long would that last? Uh, would you wait? Would that be until the taint of the alleged constitutional violation was over? Uh, would it be years and years or would it be, uh, weeks or months or what? How long would it last? We've asked your honor for a burden shifting procedure where for the government, the government, you want the government to show that there is no taint. Correct. How is that? How, how, how would, what kind of proof would the government have for that? Sure. So, um, so, so this is, this is not unusual in First Amendment retaliation claims. They would ask you a specific question about how the government would make that show or the government could get other decision makers involved who are, who are not privy to the earlier, uh, retaliatory motive, who didn't have the same retaliatory animus against Mr. Rugbeer on the basis of his protected speech. They could submit a testimony, affidavit testimony, live testimony, explaining the procedures that were followed. Um, they, they could prove as another retaliation cases that asking for discovery to say what were the reasons that motivated the order of removal, the execution of the order of removal earlier this year. We want to, we got to nail this down. Why did they choose to do it this January and February? Is that what your answer to judge Walker is? We need that. And then keep him here while you're examining that. Well, yes, Your Honor, we absolutely want discovery to show, but I would say at this, at this stage of the case, the preliminary injunction stage, the district court accepted as true our allegations and evidence. We've already submitted extensive evidence, which was accepted as true that ice. They didn't make a finding that it was true. He just bypassed it. He said, assuming it's true, I decide it's not what he said. He said, I accept as true plaintiffs is factual contention that I'd have ice officials quote, are executing the order of removal to silence Mr. Rock beer. It doesn't mean a finding. He's just saying, if we accept it as true, I nonetheless reach this result. That's not, that's not saying the court finds it to be true. I agree. He, he, he accepted it as true. He assumed that it is true that, that ice is retaliating against Mr. Rock beer on the basis of his core political speech. Do you agree that absent that absent the dynamic of, of, of your claim of, of, of retaliation, that there would be no problem with, with his deportation? You've said that in your brief, right? Yes, that's correct. Um, that, uh, you know, he, uh, if they deported him in accordance with standard procedures, like any other non-citizen, he'd had no claim. Yes. And that's, and that's true in, in essentially all first amendment retaliation cases. So what we're doing, what I'm trying to understand here is exactly precisely, uh, what your claim of, of, of prejudice is. And, and, and obviously that he was retaliated against, but then in terms of the actual orders that were entered, uh, how that, how that affected him. Uh, and so let's take a look at whether or not the government, um, the government, uh, did not give him his fourth administrative extension, correct? Correct. It revoked his third administrative without notice. I think the two are separate. It didn't grant him, the government was under no obligation to give him a fourth, uh, extension, was it? He didn't have a right to that, did he? He did not. Again, this is true in, in essentially all first amendment litigation. I don't understand. And, and did the government, um, uh, in denying or cutting short the third administrative extension, uh, violate, um, uh, some, some standard order that, that they had apart from the policy, did he have a right to the completion of the third extension? In the ordinary course, he certainly would have gotten it. It would be very consistent with ICE's ordinary procedures. I'm talking about a legal right. Uh, in other words, is, is ICE, is, does ICE have a, uh, an obligation once they grant an extension to see it through all the way through as a legal matter? Uh, no, they did violate, they did, they did violate their own regulations in other ways in connection with his removal by trying to, but not specifically with respect to the administrative state, to my knowledge. Okay. But you're saying that they revoked it early because of retaliation. Yes, absolutely. That's what we're saying. We're saying that everything that they did was because of retaliation and, but for the retaliatory motive to silence Mr. Rogbier on the basis of his core political speech, they would not have done these things. Right now. Um, but your, your point is that, um, I think that they started, uh, to, uh, retaliate against him. I guess you're, you're, you're focusing on the late 2017. Is that right? I'm focusing on the, the, the late 2017, early 2018 period. That's when the retaliation really escalated. And, but, but prior to that, the, uh, with the change of administrations in Washington, there had been a change of immigration policy, correct? Yes. I've seen in the news that there have been changes in the news. There was an executive order by the president and then they're followed up with a letter, a, a, a set of instructions from the secretary of Homeland security in April of 2017 that gave high priority to defendants with criminal records. Yes, your honor. But I'd like to cut past some of this. Again, the district court has accepted the dynamics of, of, of what your claimants was. That's part of the context. Is that of your case? Yes. The government, the government of course will deny on the merits that they retaliated. They will say that I'm assuming as did the district court that they're an element of retaliation there. But what I'm trying to understand is what the consequences are in light of the overall policy. The priority, the policy that you're describing has always been in place. It's not something new to this administration. The decision to enforce it against Mr. Rock against Mr. Rugby or on the basis of political speech is something that's new that happened. But the policy you're describing predates the Trump administration. The letter of April of 2017 from a Homeland security secretary represents no change in policy. The policy prioritizing removal of people with certain criminal condition convictions predates that the Trump administration, it does. And, and your honor, again, the question that you are confronted with here is accepting as true our allegations and evidence that, that ice is retaliating against Mr. Rugby or on the basis of his core political speech. Does that state a viable claim for a violation of the first amendment? And it is, but apart from that, I'm trying to, I'm trying to understand, I'm trying to understand what this, what you, you say, restore him to the status quo that he would have been absent the retaliation, right? Yes, correct. We're asking why would the status quo, uh, prior to the retaliation, have, have prevented him from being, uh, uh, uh, deported? You, the government cannot deport someone in retaliation for their core political speech. This is no different than an at will government employee who can be fired at any time for any reason, but not for the illegitimate reason that the government is retaliating against them or their protected speech. May I ask you, what do we do with the Supreme Court statement in, in AADC where they said that an alien unlawfully in the country has no constitutional right to assert selective enforcement as a defense against his deportation? So AADC should be read narrowly in light of its specific focus on national security concerns and the AADC plaintiffs is provision of material support for a designated foreign terrorist organization. That is conduct that those are, those are very different from this case. But what about the, what about what the Supreme Court said? Uh, the Supreme Court made a broad statement in justification of the justification in justification of what happened in that case. And the justification included the proposition that I just read to you that, um, uh, which seems to be exactly contrary to what you're arguing, that an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense to his deportation. So I think AADC, as we explained in our briefs, AADC is best read narrowly, um, to, to apply in the context in which it arose involving terrorist activity, not core political speech. But even beyond that, AADC and this court's decision in Raja recognized that the government's retaliatory enforcement of the immigration laws does violate the First Amendment when it is outrageous. And it's outrageous here for three reasons. I'm short on time, so I'd like to get them out. Take your time. Go ahead. First, um, this was a symbolic act by ICE designed to stamp out the anti-ICE sanctuary movement in New York. I'd like to focus on three factors that highlight the outrageousness. One, this is viewpoint discrimination against core political speech. It is the worst abuse of government censorship targeting speech that's not only protected by the First Amendment, but that occupies the highest rung in the hierarchy of First Amendment, uh, values and is entitled to special protection where the First Amendment is at its zenith. Secondly... I don't, you know, I, I, I don't, you know, I, I mean, you want to keep him in the country for as long as possible. And, uh, I understand that, that, uh, he's your client and so forth. But my question is, uh, how long, how long is appropriate under those circumstances? The likelihood of success goes to the likelihood of prevailing on the First Amendment claim. Respectfully, Your Honor, I think what you're talking about are the details of the proper remedy, the proper scope of injunctive relief. Those are questions... I'm wondering whether or not, um, the taint has worn off. He's been out for nine months now since he was released, uh, uh, from, from custody. Um, he's, he's out. Um, and you know, one could accept the fact that when he was arrested and when he was sent to Florida and when he was incarcerated in Florida, all of that could be seen to be retaliatory, but then he's out. And then the question is, at what point, um, can the government deport him? Leaving aside retaliation. And those would be questions to deal with down the line. If, if the government wants to claim on the merits and the district court... Well, maybe, maybe it's not down the line. Maybe it's, maybe it's, maybe it's the, the, that part of it is over. The retaliation part is over. Can you enlighten me please as to the, his status? Uh, what is his present status? Is he, is he illegally in the country now? He's not ever been illegally in the country. I'm sorry. I wonder about that because... He was, when he had a final order of removal entered against him, he was released under an order of supervision that allowed him to live and work in the United States legally. He was additionally given a special administrative stay in which ICE guaranteed that it would not reverse course and, and attempt to execute the removal order for a certain period of time. I'm saying he's not illegally in the country, but he, he was, was convicted of a, and there's a final judgment of a felony, uh, against him. And then there've been various motions that he's made to try and deal with that problem. Uh, one of which results in a current stay that's in place for New Jersey, correct? Yes, there's a stay in place for New Jersey. There's been a stay in place... And then he got, then he got extensions, uh, got, he got administrative stays from ICE, uh, which were abrogated, um, back in January or thereabouts, right? Um, and, and, uh, and, and, and so he, he, he didn't get the fourth request granted and he got the third request truncated, the third stay truncated. Uh, so, but he's, he doesn't have, he's not a lawful permanent resident anymore, right? He's not. He has a final order of removal against him. The question I understood was whether he's in the country illegally. He's not. He hasn't ever been, was my answer. Because of stays. Because of, because first of ICE's... If all the stays were lifted, uh, he, he, he would be illegally in the country and required to self-deport. Because of the order of supervision that ICE gave to him. Again, there are millions of people living in this country who are removable the way that he is. ICE is not rounding them all up. Correct. And, and, and he, so he is here legally. If I could, if I could make one point... No, no, no, no, no. That's my question. If he's removable, he's not here illegally. He's not here illegally. You can answer Judge Walker's question. He's just deferred. Uh, it's, it's been deferred against, against him. The government has expressly allowed him to live and work in this country, even with the final order of removal throughout the entire period. So my question is this. So let's assume, uh, there's some meat on outrage, the word outrageous in AADC, that there are some circumstances where retaliation, uh, can create standing in a case like this. Uh, the question is a slippery slope problem. And that is, would, what would happen if we were to agree with you that AADC through the outrageous channel allows for a First Amendment retaliation case to have standing like this one? What's, what's, what comes down the line with all the other people who are going to get removal orders or have their stays lifted? Are they going to claim, well, that, that's because I spoke out, I was in the Hartford Kern, I was in the New Haven Register, the New York Times protesting immigration policies of the federal government. How, how would we, how would we be able to focus on those cases that really have some substance to them, uh, in, in evaluating a First Amendment retaliation claim? Your Honor, Your Honor, I've, I've, I've three points. Um, first of all, AADC has been on the books for 20 years. This Court's decision in Raja, uh, making clear that the outrageous exception has teeth, has been on the books for a decade. And there's been no opening of floodgates to claims like these. But didn't mention, didn't mention First Amendment speech, Raja. AADC is a First Amendment case that recognized the outrageous exception in the context of the First Amendment. That's 20 years old and there's no, been no opening of floodgates. So it was, it's First Amendment retaliation was, was claimed by the, by the, by the plaintiff in that case. Yes. And there are, there are two other points I want to make. And that, that plaintiff did not fare very well, did he? Yes. The plaintiffs in AADC were providing material support for a designated foreign terrorist organization. Conduct that the Supreme Court has since held is entitled to zero First Amendment protection. They were claiming that because they were members of a group that was disfavored, uh, that they, they were denied their associational rights under the First Amendment. Um, you can go read the, the government's briefs in that case. They, they were alleged to have provided material support for a designated foreign terrorist organization and that's why they were targeted. My other two points were on the, on the question of opening these floodgates. This notion that removable non-citizens will begin publicly criticizing ICE in hopes of extending their stay in this country is, is speculative and frankly, it's unrealistic. No, no. It's highly unlikely. I mean, it seems highly unlikely that somebody whose hope is to stay under the radar, um, and, and not get deported, even though he's under a, an order, uh, of, of, of removal, it seems highly unlikely that such a person is going to start agitating against ICE, uh, in the hope of providing a defense against the eventual deportation. Absolutely. I would put an, I would, I would put an even finer point on it. That is exactly my point. I would say no rational person, um, no, no rational removable non-citizen, uh, would conclude that publicly and prominently criticizing ICE and US immigration laws would somehow be a good strategy to extend your stay in this country. I think as recent events make, how about after you've, um, been, uh, singled out for a deportation proceedings and they've been commenced against you, uh, at that point, uh, you're not in the, not, not, you're not out of sight at that point. You're, you're present and, and you're engaged in immigration litigation, uh, and you start speaking out against ICE at that point. Could you raise the claim of, uh, retaliation? Well, first of all, even under that hypo, the, the commencement of the removal proceedings began before the person even spoke out. So you could never even plausibly allege, much less establish and prove. There's all sorts of discretion that occurs. We've, this case is all about the exercise of discretion at various stages. I think that in this case, uh, execution, but it also could be adjudication or initiation. I think that that hypothetical is even less realistic and likely than the one that judge LaValle was talking about. Hypothetical that you, that you could succeed. I agree. Hypothetical that someone would even try it. No rational person in, in removal proceedings would think that they could successfully extend their stay in the country by publicly criticizing ICE. And wait, wait, wait a minute. I don't understand that. What you could do is criticize and then if they proceed, if you're, if ICE proceeds against you further, then you go to court and you claim that this is unlawful retaliation. And then there's litigation. Uh, there's litigation before the district court and then it has to go to the court of appeals. Uh, all of that buys you time in the country. Why isn't that a perfectly rational way to approach it? Non-citizens rely on ICE's discretion to protect them from imminent deportation after the process starts. No rational person in that situation would, would try to increase their likelihood of staying longer by publicly criticizing ICE. As recent events make clear, any non-citizen who speaks out against ICE does so at great personal risk to themselves. Not everyone is going to have the, the fortitude that Mr. Roggebeer has to put himself in the line of fire. And in any event, the claims would, they would fail overwhelmingly under everything that we're talking about. Because in a first amendment retaliation lawsuit, it's not enough to allege and prove that you have, you have spoken, that you have exercised protected speech. You have to prove number one, that the government officials know, know about what you've said and, and that they are in fact taking adverse action against you because of what you'd said. And there would be no plausible basis in the types of manufactured cases that you're, um, hypothesizing to make those claims. Your honors, I'd like to make one more point before I sit down and I realize my time is over, but there's, there's something I'd like, I think the government should answer because it's a point we made strongly in our briefs and the government didn't answer it. And it's this, the, the government's narrow view of the first amendment would invite unchecked abuse. It would create a first amendment black hole where removable non-citizens have no right to speak out free from the threat of retaliatory, uh, deportation. ICE could tell any removable non-citizen, don't criticize ICE or we will deport you. They could say, don't engage in any political speech of any kind on any subject expressing any viewpoint. Why isn't this, that, that, that set of hypotheticals that you opposed, uh, best reserved for the case that actually presents them? I mean, sure, uh, there are all sorts of abuses that could, could occur. One can, one can conjure up a lot, a lot worse than that. Uh, one can conjure up actually, uh, you know, physical violence and so forth because by the government, I mean, if you accept the government's position in this case, that the first amendment substantively does not prohibit ICE from retaliating by attempting to deport people on the basis of their political speech, there's going to be nothing left to decide in those future cases. The law will already have been made that the first amendment confers no protection. But in your reply brief, you say the government does not dispute that any statute purporting to strip federal courts of jurisdiction over colorable first amendment claims would violate both the first amendment itself and article three. And the government has made that representation to you. Is that right? I'm sorry. Could you read the last part of the quote again? I didn't quite. Well, it's your brief. Yes. Sorry. We've got a lot of things in our brief. The government does not dispute that any statute purporting to strip federal courts of jurisdiction over colorable first amendment claims would violate both the first amendment itself and article three. Yes, that's the point I made earlier about jurisdiction. It is uncontested that if the plaintiffs in this case have stated a viable first amendment claim, then it would be unconstitutional for section 1252 G to strip jurisdiction over that claim under the suspension clause article three and the first amendment. I know your red light's on, but so it's basically what you're saying, as I understand it, is that 1252 G strips, would strip the plaintiff of the courts of jurisdiction to hear the plaintiff's claim. And that it has particular resonance with regard to the execution of the deportation order, which is after the litigation of the deportation order itself. In other words, if it's in the process of adjudication or initiation and the constitutional claim arises, then that can be channeled into the deportation order. But if the grounds for your claim of constitutional violation occurs after that, there is no vehicle other than through habeas in which that can be vindicated. Yes. There's no availability of channeling here for all the reasons that we explained in our brief. The government's position here is that section 1252 G denies all judicial review. It doesn't channel in this instance. It denies all judicial review. Further from your argument, AEDC did not deal with that final situation. AEDC dealt with the channeling before the final order. There was the ability to channel before the final order, although AEDC did grapple with the question of whether it was constitutional to deny jurisdiction in that context. That was what led the court in AEDC to conclude that in the context of people providing material support for a designated foreign terrorist organization, they hadn't stated any viable First Amendment claim in the first place. So there was no constitutional obstacle to applying section 1252 G. And, Your Honors, we're going to, you've got a few minutes for rebuttal. Why don't we hear from the other side first? Thank you, Your Honors. To the government? May it please the court, my name is Stephen Kochevar and I represent defendants in this matter. AEDC controls this case and I want to address a few points made by the other side on AEDC. Material support for terrorist organization was not involved in AEDC, in the AEDC decision. It doesn't appear in the published opinion. It is not the... What could be more outrageous than denying somebody their First Amendment rights? If that, if that statement from the court in AEDC is to have any meaning, how could it not apply to First Amendment retaliation? Is there any star in our constitutional firmament that's more important than that? So First Amendment retaliation was at issue in AEDC. And in fact, the facts of the AEDC are substantially more outrageous than those present here. In AEDC, the... But in AEDC, the channeling could work. In other words, there was an opportunity to raise the First Amendment retaliation claim in the normal process of adjudication of removal orders. I believe it actually says in the AEDC opinion that the government conceded there, and so the Supreme Court accepted that these sorts of constitutional retaliatory claims could not be raised before an IJ or the BIA. And so... It could be raised at the Second Circuit or in a court of appeals on a petition following the decision to remove. So the holding in AEDC was that there was not a constitutional claim, that there was a rule that these sort of First Amendment selective enforcement claims cannot be raised as a defense to get deportation. So there was not going to be any claim ever there, because the Supreme Court held that there was not a constitutional claim. In the context of sending terrorists out of this country, Palestinian terrorists, here there's no claim that Mr. Ragger is a danger to the United States. There's no 9-11 problem. There's no terrorism problem. Isn't that different from AEDC and from Raja in our other case too? Your Honor, to be clear, the aliens in AEDC were not terrorists. It's stated actually most clearly in Justice Stevens' concurrence. He says clearly that Congress could not authorize punishment of innocent persons because they happened to be members of an organization that engaged in terrorism. So it's clear in AEDC they were not providing material support to terrorists. They were members of a terrorist organization. I'm sorry? They were members of a terrorist organization. The first statute that was used against them was the anti-communism statute. Then it was changed to the anti-terrorism statute, correct? Actually no, Your Honor. Six of the aliens in AEDC, they only had technical violations. It was visa overstay issues. That's why immigration proceedings were initiated against them. That wasn't the real reason they were looking for them. The immigration authorities gave a press conference where they stated that yes, it was a pretext to go after them on these technical violations. We would argue that makes AEDC significantly more outrageous than the present case where there are clear, valid reasons that have nothing to do with retaliation that do not involve First Amendment speech. Let me ask you this. Supposing that the record in this case were that high officials of ICE had gone on the record to say that the record reflected instructions saying, these people have been criticizing us. We're getting bad publicity because they're criticizing us. Let's get them out of the country. Let's make these people who criticize us a priority to deport as soon as we can. Would that be something within our jurisdiction? Would that be something that could be considered by this court as a reason to bar the deportation? To be clear, Your Honor, that's not this case. I know. I'm asking you my question. Under the general rule of AEDC, there would still not be a constitutional claim there. The question would be, would that be an outrageous case where the exception in AEDC could apply? It's not more outrageous, necessarily, than this. It's just that there's evidence of what's going on. We don't know the facts here. The district court assumed, for purposes of its decision, that this case is like the one I'm asking you about. Assumed that the reason for the deportation is because to shut down a critic of ICE. Yes. And so that would fall under AEDC's clear holding that aliens do not have selective enforcement claims as a defense against deportation. Unless the circumstances are outrageous. Well, is it outrageous? Is it outrageous for ICE to say, if they criticize us, out? Is that outrageous? It is not outrageous in the circumstance of this case for ICE to not exercise its administrative discretion to not grant an additional administrative stay of removal for a criminal alien who's been subject to a final order of removal for 11 years. It did more than that. It didn't just not grant the fourth stay. It truncated the third stay and arrested him and put him in jail and moved him out of the city. So if ICE had sat back and nobody had said anything, Mr. Machete or whatever his name is, the fellow at ICE, the ICE people had said nothing and just let things go at their normal course. The third stay is exhausted and now he's asked for a fourth stay. I'm sorry, that fourth stay is denied. We've got a new administration, new policies. Then under those circumstances, I don't think there'd be a possible claim here on their side. They're saying no, that they acted precipitously because of what was happening, because of the speech that was given and the criticism that was given. So Your Honor, ICE did not violate any applicable statutes or regulation in cutting short the third administrative stay of removal. They acted consistent with the law there. So you're saying he didn't have a right to the completion of that third stay? Correct, and it was a matter of weeks. No, it was a matter of weeks. Discrimination and First Amendment arguments presuppose that nothing illegal has been done. If something illegal were done, you wouldn't need to go to discrimination and First Amendment retaliation. So the illegality in such cases lies in the discrimination and or First Amendment retaliation. I believe that point goes to- That what was illegal by curtailing the stay that had been granted is kind of meaningless. It avoids the question. I'm sorry. I was trying to answer Judge Walker's question on that. I don't think the circumstances of the revocation of a third stay were outrageous in any way. It was a matter of weeks. They complied with all the applicable regulations. The government- Its pertinence is that it's evidence of First Amendment retaliatory motivation. I'm not sure that a revocation alone, that speaks directly to the government's discretion. Accompanied with the statement, we've decided to move rapidly now. We're cutting off the third stay. We're not going to grant the fourth stay, and we're arresting you on the spot. That's part of the evidence that the other side's pointing to. As an initial point, what I would say is that we don't need evidence in this case, and it would defeat the purpose of 1252G to look to the evidence here. However, if we are going to look to the specific facts, there were specific operational reasons that Mr. Ragbir's third administrative stay of removal was revoked early. That had to do with a chartered flight to Haiti involving a different alien. Do you deny that one of the reasons that they acted so quickly this year and the end of last year was his speech? Was his leadership of this organization and being in the paper a lot protesting ICE policies? Do you say there's no basis for that whatsoever in the administrative decision to send him out of the country? Our position here is that it's not necessary for a court to sort through those facts, and in fact would defeat Congress's purpose in passing 1252G, because for every case like this there would have to be a hearing, there would have to be an examination of the executive's discretion. Do you deny that factually that happened? And I'm sorry, could you? Yeah, it's a pretty obvious question. The reason they moved so quickly on Mr. Ragbir is one of the reasons for that is because he was such a public opponent of immigration policy. Is there any basis for that whatsoever in the administrative record in this case? No, Your Honor. There are declarations from the decision-makers involved that they did not – actually, I take that back. They only took into account his activism, specifically the purpose for the details of his removal on the day of, and that they were aware that there was probably going to be some protest. And so they did make some operational decisions strictly for safety purposes, which were borne out. There were demonstrations that day. So other than that, no. His activism, his speech was not the basis for the deportation decision against him. Not any part of the basis? I'm sorry? Not any part of the basis. It couldn't be further from our minds. I believe the declarations state that no. The basis for the decision to revoke his stay and not grant him another one was that the sole avenues of legal relief he had was a voluntarily withdrawn. So, Decker's decision, as stated in his declaration, says that that was the basis for his decision to move forward with Mr. Ragbir's removal. And he states – You just mentioned that the quorum nobis has been withdrawn? I'm sorry. He – no. That one is pending. He filed an earlier quorum nobis petition that he voluntarily withdrew in New Jersey, and then he later filed it again. And I believe that may have – well, I believe we're on the second quorum nobis petition in New Jersey. He's subject – by the way, he's just – well, let's finish. Why don't you finish answering Judge LaValle's question? I wanted to get – I wanted to get to – he's – right now, he's subject to a stay, whatever happens. He's got a stay from New Jersey, right? That's correct. Okay. And that's pending his completion of his litigation over there, trying to get the original conviction lifted? Yes. The quorum nobis petition in New Jersey is fully submitted. There was a hearing on it. It's also been – the stay specifically has been appealed to the Third Circuit, and I believe the merits brief is due November 2nd there. Let me ask you this question. AADC, which basically held that 1252G is a channeling – is part of the channeling process of 1252 generally, right? That those claims are – if any constitutional claims are supposed to be heard at the time of the order of deportation is petitioned over to the Second – over to the Court of Appeals. Is that correct? And that's the only place in which constitutional claims can be heard? No. I believe, Your Honor, AADC categorically stated that if things fall within 1252G, the  I know that they said that, but part of it – part of that whole section is to channel – leave G out of it. That whole section is to channel claims into the order of deportation proceedings as a general matter. Correct, Your Honor. That's where the constitutional claims are supposed to be heard. Yes. As a general scheme, 1252 channels such claims to the petition for review process, but – You're saying that 1252G cuts off all constitutional claims, period? We're saying that under AADC there is not a constitutional selective enforcement claim in this context, but – That's in the context of the fact that constitutional claims can be brought in the normal course in deportation orders, and they can be heard by Courts of Appeals under that – in that context, right? So the issue here is that there is not a constitutional claim to be heard. So this – Well, that's what you're arguing. There's no constitutional claim to be heard because this is selective enforcement. Right. No matter how egregious it is. You know, they beat him up, subject him to all sorts of excessive force. He complains about it, and he also complains publicly about it, and then they want to deport him. I'm trying to think of the worst possible scenario. He would have no claim because no matter how egregious it was, it amounts to selective enforcement. No excuse for enforcing against him will fly because it's selective enforcement, and that can't be challenged. Well, there is – the Supreme Court left open in AADC the possibility of an outrageous discrimination exception, but in framing it, they cast it as one where the separation of powers consideration set out in AADC could be overcome. So there the issues are things like delay, chilling of enforcement, difficulty enforcing the immigration laws. And so that's how this Court should think about that outrageous exception. You can't bring this claim in the petition for review process under 1252b9. In other words, you can't bring this Court from a decision of an IJ, an appeal to the BIA, of some constitutional issue. We have to decide whether it's a real constitutional issue or not. If it is, you can bring it. But you couldn't bring this claim in the petition for review process because this post dates it by 10 years. It's the execution of the removal order. So there's no benefit of 1252b9 to Mr. Ragbeer, right? Yes, that's correct. Our position is that if there are claims that should be channeled to the petition for review but they cannot be raised there, then Congress's intent was to remove jurisdiction over such claims, and there's not a constitutional – That raises the question of the suspension of habeas. Was it a violation of the suspension clause in that context, if it's applied in that context? And so there are – I can certainly see how the channeling of it into a review of a petition for review would cover the constitutional claims that were viable up to that point. But thereafter, to say that there's no way that they could be brought into federal court kind of runs against our whole system of justice. So, Your Honor, AADC holds that there is not a constitutional claim in this situation. AADC considered precisely the problem that you have in mind. These are different facts, though. They were not dealing with the post-execution – the execution problem after the petition for review had been determined. So the differences between the circumstances of AADC and the present case cut against Mr. Ragbeer here because in AADC, they had not received the benefit of full immigration proceedings and hearings. They were just at the start of the immigration process. Here, Mr. Ragbeer has repeatedly come to this court on PFRs. He's received extensive due process in his immigration and his criminal proceedings. Not as to this claim. I mean, not as to this claim. I know he's been through this court before on the appeal of the petition for review denial, but he couldn't bring this claim, as Judge Walker points out, because it didn't happen then. It's only happened in the last year. The relevance of the past proceedings is that it shows that this is not an outrageous case. Mr. Ragbeer is a criminal alien. He committed a serious financial crime, and there's no question that he's removable from this country, unlike the aliens in AADC. That's not the issue. The issue is whether the decision to move ahead rapidly with carrying out and executing the long-ago entered removal order was motivated by First Amendment retaliation and whether under the terms of AADC, that constitutes a sufficiently outrageous violation of the Constitution. But the reasoning of AADC makes the considerations that I was just listing relevant, because AADC is based off of concerns about delay and difficulty of enforcing the immigration laws. Exactly the concerns that the Supreme Court had in mind in AADC are present in this case. That case didn't involve, as Judge Walker has been pointing out, that case didn't involve the problem of suspension of the writ or removal of a channel to vindicate the right. But I believe that it did, Your Honor, and that the Supreme Court's exactly these arguments of constitutional avoidance and habeas issues were raised in AADC. And that's where the Supreme Court put forward its rule that there is not a selective enforcement claim for aliens to raise against deportation. And the basis for that rule was the classic concerns about judicial review of prosecutorial discretion. There is delay and difficulty in enforcing the laws if we're going to have And this case speaks precisely to those concerns. Consider the relief that plaintiffs are seeking here. It's an open-ended relief that essentially they're asking for delay. We would have probably two rounds of litigation in the district court before the government could accomplish Mr. Ragbeer's removal, because there would be this case. And then at some future point, when the government ostensibly attempted to remove him again, there would probably be another trial to see if the taint had been removed. That's precisely what the AADC court had in mind. There's troublesome questions, this categorical across-the-board removal of jurisdiction by the statute. I mean, supposing, for example, that a pattern appeared in which you could see, or that they were an express declaration. Either you see it from a pattern or they were an express declaration. We've got a lot more people under orders of removal than we can possibly remove. So who are we going to move against? And supposing that you see that it's only people who are not white-skinned who are being removed, and that the ICE simply devotes itself, or only Jews, or only Catholics, or only some category like that. We're focusing all our removals now on dark-skinned people. Get them out of the country as fast as we can. All those things, by the terms of the statute, are outside the jurisdiction of the federal court and not remediable. Is that appropriate? So discrimination on the basis of immutable characteristics, this court recognized in Raja, that would probably call for some remedy. That was... So why, if that calls for relief, why not discrimination on... What about practicing religion? Somebody who practices Jewish faith, or Catholic, or whatever? So religion is mentioned in Raja. It's an immutable characteristic under that rubric. So that's a consideration there. Raja did not actually find that the outrageous exception applied there. It just put that out as a possibility. But AEDC and the present case do not... They're about First Amendment speech. And AEDC is substantially more outrageous when it comes to discrimination against First Amendment speech than the present case. Again, there was a clear statement at a PREFS conference by the immigration authorities in AEDC that they were going after certain aliens because of their association. These are not criminal aliens. They were going after aliens for technical visa overstay violations because they didn't like the organization they were part of. And the present... It was a terrorist organization. We agree with that, right? They were designated by the State Department as a terrorist organization. I don't think that there was... AEDC does not say that the aliens themselves were providing material support or that they were members of this organization. That is associational speech. Here there is a... They weren't criminal aliens, to put it your way. Yes. Here there is a criminal alien who has been subject to a final order of removal for many years. And there are many good faith reasons for him to ultimately be removed. So that makes this case not outrageous under the AEDC rubric because it implicates exactly the bases for the AEDC general rule. It's true of everyone who's under a deportation... Under an order of removal is removable and presumably lawful. Lawful order of removal. Otherwise it could have been overturned as an unlawful order of removal. I'm sorry. Yes. AEDC sets out a general rule that will apply in most cases precisely for the reasoning in AEDC. The point of 1252G is to end the fragmentation and prolongation of removal proceedings by protecting certain discretionary decisions made by the executive. And yes, to your point, there are many cases like Mr. Ragbeer's and if every single one has to have litigation in the district court over the executive's exercise of... My point is that if you're a member of an immigrants' rights group, generally speaking, and you happen to be under an order of deportation or you've had a deportation, and the First Amendment retaliation claim is open to you because you're a member of that immigration rights group, that they would effectively be able to achieve immunity from deportation on that basis. Correct, Your Honor, and I believe... That's a problem. I mean, you know, that's something that maybe the other side might like to address because there is an issue on that score if, let's assume that Mr. Ragbeer has colleagues, many of whom are subject to deportation and they're here, they're good people, they're acting in good faith and so forth, they're supporting their cause, but then they could presumably raise the same claim. Certainly, that's correct, Your Honor. I would say it even goes further than that. Plaintiff's complaint demonstrates that individuals don't even have to be members of activist organizations to raise such claims. There's an alien identified in plaintiff's complaint who began a hunger strike after ICE told him it would enforce his final order of removal, and then that became the basis for his discrimination claim on the basis of First Amendment speech raised in the present lawsuit. So there will be many claims like that, and Congress has repeatedly legislated through ARERA and the REAL ID Act to... I guess that those claims could be made. Your other side says, well, they're not going to be successful because they can be sorted out, but your answer to that would be, well, no, but it requires litigation, and therefore they would have to stay in the country during that period. Correct. My initial point is that AADC considers precisely these claims and sets out as a rule of constitutional law, they do not have such constitutional claims. And we're only talking about these other things if we're fitting into this small and sort of underdefined, outrageous discrimination exception that no court has ever applied. Thank you. While we hear from Mr. Jones, you've got a few minutes left. Thank you. Could you just respond to my last point? If you've got somebody, let's leave Mr. Ragbear aside, somebody who's working for an immigrants' rights group here, but he is subject to deportation. He's got an order of deportation against him, and maybe there have been stays, et cetera, but the stays are lifted. And now he makes the claim that there is a First Amendment retaliation problem. Then he would be able to stay in the country... In the ordinary course, there's not going to be any plausible basis to assert that the In most cases, people won't even be able to plausibly allege that the government actors knew about the speech. Mr. Ragbear is famous. ICE knows about him and his speech and his political activity. In most cases, that won't be true. There won't be a plausible basis to allege any of this, not that the speech or the membership was a but-for cause of the retaliation, even that any government actor knew about it. I'd like to make three quick points, and then... Well, take the hypothetical a little further. And the particular individual makes a habit of going on TV and is able to be on TV making speeches all the time. And under those circumstances, he would be entitled to immunity. ICE knows about it. Everybody knows about it. Yes. If a person can plausibly allege that ICE is trying to deport them in retaliation for their political dissent in this country, yes, that violates the First Amendment. That's our position. It also gives him immunity from ever being deported. It doesn't give him immunity from being deported ever. We aren't asking for that. We've never asked for that. We're asking that Mr. Ragbear not be deported in retaliation out of a retaliatory motive on the basis of his protected core political speech. So, opposing counsel said that the facts of AADC are more outrageous than the facts here. That statement is outrageous. You can't compare Mr. Ragbear's peaceful political dissent in this country to membership and support for a designated terrorist organization. And it's not fair for the government to say that the AADC decision doesn't speak to the provision of material support for terrorist activity. It was the government's briefs in the AADC case that highlight that what the people there were doing was fundraising for the designated terrorist organization, which is absolutely providing material support. That is what was going on in that case according to the government. We heard a lot about, you know, what's the strength of your evidence that it was actually retaliatory. In this case, the deputy director of ICE's New York field office said to representatives of the coalition, you shouldn't make matters worse by speaking out. That is about as clear, that comes very close to approaching one of the hypotheticals that I think Judge LaValle offered, which was, what if ICE said, if you criticize us, we'll deport you. This case is not very far removed from that. And our briefs and our complaint identify extensive evidence, much more than you would ordinarily see at the pleading stage of a case, that what is going on here is not the ordinary routine application of policies or priorities. It is rank retaliation against core protected speech. And if I can close, Your Honors, there is no other context in which we would even be having a conversation like this about whether the U.S. government can freely retaliate against a leading political dissident. We might have that conversation about Saudi Arabia or North Korea or Russia, but not the United States. And that's because our First Amendment stands as a bulwark against that sort of government oppression by censorship. It guarantees, the First Amendment guarantees all of us, including non-citizens like Mr. Rugbeer, the right to speak out against government policies and actions we oppose. And in any other context, we would all agree without debate that the First Amendment protects political dissidents against open and forceful retaliation like what we've seen here. Mr. Rugbeer's activism, his advocacy, and his protest stand in America's greatest civic traditions. He's a leader of his community. He's an inspiration into an entire national political movement. The government's counsel said there are lots of cases like Mr. Rugbeer. No, there aren't. What was the context of the statement by the Deputy Director of ICE? It was in the days leading up to Mr. Rugbeer's arrest and attempted deportation. ICE had just arrested and was in the process of deporting the co-founder of New Sanctuary Coalition, Gene Montreville. And in the course, in a series of discussions between ICE's Deputy Director, Mr. Metchkowski, and representatives of Mr. Rugbeer, Mr. Montreville, and the Coalition, Mr. Metchkowski made the statement, you don't want to make matters worse by saying things. He also expressed resentment about Mr. Rugbeer's political activity and criticism of ICE. He brought up Mr. Rugbeer's critical statements to the media following the March 2017 check-in. He connected Mr., unprompted, he connected Mr. Rugbeer's and Mr. Montreville's cases and described them as the two highest profile cases in his office. He disparaged elected officials. They weren't the highest profile cases because these were high profile individuals. They would get publicity no matter what, retaliation or not, right? Yes, and he disparaged also the elected officials who had spoken out following Mr. Rugbeer's March 2017 check-in. And he made this statement, you don't want to make matters worse by saying things. Do you want to wrap up in a minute or do you want me to give you another minute? Sure, I don't even need another minute. To allow ICE to deport Mr. Rugbeer in retaliation for his advocacy and his activism on behalf of immigrants' rights and against ICE would betray our most fundamental, foundational, our most basic First Amendment freedoms and the right to free speech. We ask that you reverse. Thank you. Thank you. We'll reserve decision on this case. Our next case is on submission. So I'll ask the clerk to adjourn court.